Good morning, your honors. My name is Lauren Regan. I represent plaintiffs Cascadia Wildlands Project and we're also the appellants. My intention today is to focus on two of our claims, the Soils Claims and the Porterford Cedar Claim. And I'm open to questions if there are any on our other claims. The crux of these two claims are based upon NEPA and NIFMA. NEPA requires the defendants to disclose and take a hard look at potential impacts to the environment before the action occurs. Where NIFMA requires the defendant to conduct, in this case, scientifically adequate surveys and ensure compliance with the forest plan before the action occurs. In our case, the NEPA compliance came too late and the NIFMA compliance was too little. With regard to soils, we believe that the final environmental impact statement for this project did not give the hard look at effects of the project on soils in the analysis area or the activity units, they're also called. NEPA requires compliance with these relevant standards and that it be demonstrated within the EIS itself, pursuant to neighbors of Cuddy Mountain. The conclusions of the defendant's experts must be premised upon hard data that is contained within the project file at the time the decision is made to approve the project, which would have been in 2003. The Forest Service chose this 500,000-acre timber sale size and they needed to properly survey the soils within that vast area before they made a decision on that. They could have done a programmatic EIS and then have tiered EAs to that site-specific level of analysis, but they didn't do so. We've cited several cases in our briefing regarding national parks, the Lands Council decision, as well as Kettle Range decision. If the Forest Service proposes to increase the risk of harm to the environment, then it must perform these soil studies and it must do it at the timber sale unit level first before action occurs. That's from Kettle Range, which was discussed and affirmed within the Lands Council decision. In Lands Council, the court ruled that upfront disclosures of relevant shortcomings in data within the FEIF itself, not the appendixes, must be disclosed. At some point in that FEIS, there needed to be a statement, we have not done any of these soil surveys as we're required to do. The soil surveys that the Forest Service attempts to rely on now were done to assess the effects of fire on the soils. So the district court found that, made a specific finding that the Forest Service did conduct, did actually look at, physically look at, several segments of the forest and did conduct soil investigations, which is much more than what had occurred in Lands Council, which involved a theoretical model that extrapolated some photographs. I was on that panel, I remember it well. Yes. What they did is much, much more, and that's a finding of fact. Why is that finding clearly erroneous? Well, the district court found that the Forest Service conducted soil investigations on five burned areas. That was the statement of fact that the court made, five burned areas, where the requirement is that every timber sale unit area have the ground walk and soil surveys be done on each at that level. Now, where is that requirement? Why is that a requirement? I mean, that is not a requirement from Lands Council. That requirement is within the SLRMP, the forest plan itself. Can I have a help if we didn't use all these attributes? Sure, I'm sorry. The Siskiyou National Forest is the forest we're using, and that forest's plan has specific standards for soils within sections 7.2 to 7.6. Those standards lay out the actual protocols that are supposed to be followed in order for the Forest Service to determine what type of impact is going to concur. Like, for instance, 7.6 has really specific methodologies that have to be followed in order for them to prove that they have met those standards, and it has to be on a unit-by-unit area. This is important, especially for this case, because we're talking, again, about 500,000 acres, the largest timber sale in the history of the Forest Service, and it's in an area where even the Forest Service admits that there's vast diversity on the ground, meaning what is studied in one area will be completely different in another area. And so although the Lands Council doesn't have a requirement that by unit-by-unit these surveys be done, when you combine that with the requirements within the forest plan and then also combine that with the language within Kettle Range, we believe that the only way that the Forest Service can prove that they're not going to impair more than 15 percent of each timber sale unit area is to actually have some form of substantiation for that. And secondly, those surveys that were done by the Forest Service were done for the purposes of evaluating the burn. They were aerial photographs taken from the sky, or they were photographs looking for burned canopy and burned trees. The type of study that is done for actual soil productivity is much, much more encompassing. They have to measure duff, which is the stuff on top of the ground. They can't be taken from far away. There are scientific measurements that have to be conducted in order to determine whether all of these things are – how they're going to come together cumulatively, and that was not done as well. What is the status of the – who does the forest plan? Who does the forest plan, meaning who created it? The Forest Service itself. And what is the status of that plan as a matter of law? It is binding on the forest as far as the – they have to follow the forest plan within each NEPA planning document. So the FEIS has to be – By virtue of what? I'm sorry? What makes them – what requires them to follow the forest plan? NFMA, the statute, the National Forest Management Act. So the – it's a federal statute saying the Forest Service must create this plan and then follow it? That's correct. That's right. So just to quickly sum up about that, the studies that were done, the soil studies that were done, were to analyze the effects of fire, not the effects of logging on future soil conditions. And the Forest Service really has no argument in defense of the NEPA part of our claim. The documents just simply were not within the record because the ground had not been walked and the studies had not been done. Part of this reason is because they had six weeks to fully bring together everything that was going to be part of these old growth sales. Up until that point, they had only anticipated sales within the matrix area or the non-old growth. With regard to NFMA, our more substantive challenge, we believe that there is nothing in the record that can in fact prove that they will not harm more than 15 percent of the soils, that the information that they have provided is not reliable in order to establish that they are doing what they need to do. And the Forest Service has actually conceded, just like in Lands Council, that it, you know, in Lands Council it says, the Forest Service concedes that it did not test much of the activity area. They had done some site inspections. That's at page 1024 from the amended opinion. And they had done aerial photography and a couple other things. It's basically the same exact facts here. They had some aerial photography. They had done some pictures. They had a couple maps. And again, they had done some study based on the effects of fire. But they admitted that they had not even laid out the actual units within these timber sales until after the EIS came out. So they hadn't even decided where in fact they were going to log until after the decision maker had made their decision. And we wonder, you know, how the Forest Service could say that they have complied with NEPA and NIFMA when that vital part of information hasn't been done. So we're basically saying- I have a question. Sure. In terms of, obviously this is a preliminary injunction, so we have to show irreparable harm in environmental cases. That's a lesser standard. But I'm wondering, how does the fact that this is timbering of dead trees as opposed to live trees play in this analysis? Well, for soils, really it's almost more of a threat to the long-term harm. The fact that the trees are burned or not burned- And again, you know, it was a mosaic, like we indicate in our brief. Sixty percent of the forest was low burn or not burned at all. But with the scorching of soils, there are specific factors within that forest plan that says you specifically have to analyze burned soils. Because when you're talking about long-term productivity, whether trees will be able to grow there again, whether erosion is going to be an extreme factor, et cetera, et cetera, burned soils are much more fragile than even normal soils. So we would say that there should have been an even more inquisitive study done on the soils level, because the chance of harm is so much higher, which is- What controls the level of effort that the Forest Service puts into this kind of a study? What controls the level of effort? Well, I guess the Forest Service- We know that they can't just fly airplanes over it. Right. And on that basis make a plan. But once they get on the ground and start doing things, what controls how hard they have to work on the ground? Well, there are soil scientists and geologists that have their own kind of rulebook that they have to follow, their own methodologies for a whole litany of factors. And if you look at our reply brief, our discussion of the defendant's exhibit Q, we kind of walk through. There are probably about 20 different little things that they have to measure and observe and determine, things like downed woody debris or swales or erosion or litter on the ground. Was that a standard the Forest Service sets for itself? It is, yes. There is a lot of deference given to those scientists for doing the right thing, you know, and how they're actually going to study it. In this case, though, there's no dispute that they didn't actually do any of this level of study. Or if they did do any, it was incomplete and cursory, and it was done after the fact, months and months after the decision was made. So there are a lot of regulations that go into how soil scientists come up with their decision making. And I think we cited in the record that their own soil scientists and their lead project designer were lamenting the fact that they had no time to complete these. So this was a known situation, that they were up against the clock, they were rushing to try to get something done enough to put it together in an FEIS. And with our NIFMA claims, you know, as well as our Porterford Cedar claims, we're also arguing that at the very least they need to do a supplemental EIS to include this information. And we just, we kind of argued it quite a bit in our brief. But Exhibit Q, not only is it a post hoc rationalization, but it's irrelevant to our NEPA claim. And if this is all they've got as far as NIFMA compliance, we believe that that's not enough. With regard to the Porterford Cedar claim, this is a NEPA disclosure case. We're not arguing that the mitigation efforts aren't enough or that they're not complying with them. We're arguing that they didn't do the site-specific analysis. In Kern V BLM, the government tries to kind of throw a red herring into the mix. We're not arguing that the programmatic EIS, which is called the Porterford Cedar Supplemental EIS, we're not arguing that that's inadequate. What we are arguing is the second prong of that case, which says that they have to do sufficient site-specific Porterford Cedar analysis. Every NEPA document for a timber sale within a Porterford Cedar area must analyze site-specific impacts of this fungus, this fatal fungus, on these rare cedars. And the FEIS in this case did not do that. The Forest Service has admitted that there is uninfected Porterford Cedar worth protecting within all of these salvage sale unit areas. But the EIS assumed that wet season and wet weather activities would not take place, period, except in periods of unseasonably dry weather, which is not an issue in this case. We weren't having unseasonably dry weather all winter long in southern Oregon. The interveners are being... Because Idaho gets most of its weather through Oregon, and we had a very unseasonably dry winter. Well, we had very heavy rain and precipitation in December. It tailed off for a couple months, but overall... But in those two months, those were the driest, almost the driest months, those months on record, right? We had one month that was unusually dry. I think the Forest Service claimed that it was the fifth best drought we had had in a while or something like that. But we showed a bunch of weather records, and there really was no dispute over the fact that it still rained and it still snowed, especially up at Fiddler Mountain, which is where this logging was taking place. So we're not talking unseasonably dry weather, because if we were, the Forest Service never would have needed to get these waivers, which I was just about to talk about. Instead of following the Porterford Cedar EIS and the Biscuit EIS that assumed no wet weather activities were taking place, the Forest Service issued these waivers that basically did away with the number one protection within the Porterford Cedar EIS, which was written over a period of years by Porterford Cedar experts. The mitigation measures, such as washing, are actually necessary in addition to this wet season moratorium. And there is no distinction between hauling and cutting and all of these other issues that were brought up by the defendants. The Porterford Cedar EIS, the Biscuit EIS, and even the timber sale contracts themselves say all operations will not occur between September 31st and, or September 1st and May, October 1st through May 31st. That is the wet season where this prohibition takes place. In addition to that, that wet season moratorium also applies to any time of year where wet weather occurs. Again, you're talking facts, and again, the district court judge found otherwise. He found that there was a paucity of evidence that the innovators were hauling logs during conditions not contemplated in the FBIS. Hauling, again, the judge was focusing on something that was irrelevant. The documents themselves say operations. The judge said that we didn't prove hauling. There was no dispute that timber falling, timber cutting, road construction, all of these other things, there's no dispute that those were going on. For some reason, Judge Hogan said that hauling, which means actually putting them on the trucks and driving them down the roads, did not occur. No, but don't you have to do all those other things you just mentioned before you can haul? Yes, and they were going on. I mean, there were multiple units being logged at the same time. So while trees are being cut in one area, which requires loggers driving up and down the roads, et cetera, et cetera, while some units were being cut, other units were being hauled. And so I think that that statement is really irrelevant to the issue that we're fighting over, which is if they were not going to follow this outright ban, they needed to disclose it in the EIS. If they were going to issue waivers or if that was a possibility, they should have disclosed that we may elect to waive this prohibition. But they did not do that, and so that's why we're arguing at least an SEIS needs to take place. At page 54 of the federal brief, they mention some cases in the district court that have gone to the Ninth Circuit challenging the same project. One of them just came out recently, but they cite the Ninth Circuit case number 0435749, which they say was an affirmance of the denial of a preliminary injunction and two consolidated cases challenging the same project. Is that any of those issues? Completely different claims. We are the only case of the Biscuit cases that has raised a Porterford Cedar claim, and as far as I know, we're the only one that's challenging the soils on the NEPA and NIFMA basis, as we've done in this case. And as to harm with Porterford Cedar, just to kind of finish up and then I'll be done, the impacts of it, it kills the cedar permanently, and the cedar compose almost 50 percent of most of the riparian area. Now, these rivers are extremely pristine. We've got threatened coho salmon, and it's one of the best enagement salmon runs in the whole country in the West Coast. And so if we lose 50 percent of the riparian area in an area that's been burned, we're going to have extreme changes to temperatures, shade, and other things that will impact a wide variety of environmental concerns here. So both the Porterford Cedar and the soils claims, the harm is going on now. It may have already occurred. I mean, part of this extreme concern with the Fiddler area is that there was a pocket, or there is a pocket, of infected POC on the way to where this logging was taking place. So you have a large chance of being able to spread it. And once it gets into a watershed, it impacts the entire watershed and will kill basically all the trees within that area that make contact with the roots and the soils. And just to iterate, the standard for an injunction in an environmental case obviously is fairly deferential. If we can meet our threshold requirement, the rule of law is to preserve the status quo, and that is what we're asking for in this case. Preserve the status quo so that further study can be done to determine whether or not these grave impacts will occur. Thank you. Good morning, I'm Lisa Jones from the Department of Justice, and with me at council table is Julie Weiss, counsel for the intervenors, American Forest Resource Council at all. I will be using 12 minutes of our time, and I will watch the clock and try to ensure that Ms. Weiss gets eight minutes. May it please the Court, this case involves the catastrophic Biscuit Fire of 2002. And as the Court noted this morning, unlike a more typical sale of green timber, this is a sale that involves only dead trees. And it's also atypical in a sense, and it's very different from the lands council case in that most of the area, over 73 percent of the area that burned has actually never been logged before. So issues of things like soil displacement and compaction weren't just not an issue because you didn't have the kind of intensive logging that you saw in lands council. There had been 40,000 acres in lands council approximately that had been harvested before where the new activities were going to occur. And here, that's just not the case. The project, as we discussed in our brief, actually is quite good for some wildlife because the fire itself left so much standing dead wood and also downed wood, and as we pointed out, 96 percent of the biscuit project area will be left untouched. The salvage operations will only occur on 4 percent. As Ms. Reagan focused on her soils and POC arguments, I will do the same and start where she left off. And I think that the best thing for me to do is to begin by setting the record straight a bit about what actually happened as far as analyzing soils post-fire and what the record shows. So there is some great disagreement between the plaintiffs and the Forest Service here. We can see that there was an initial screen done that included aerial photography and included some satellite infrared data, and there was extensive mapping done of the soil types and the impacts on the ground, and then there was some immediate rehabilitation of very early on. The Forest Service also used a model, which is called the Disturbed Watershed Erosion Prediction Project, and that model looks at erosion. Like I said, already, because 73 percent of the area doesn't have displacement or compaction, which is not caused by fire, but which is caused by prior activities and also by activities using tractor logging, which is the real ground-disturbing type of logging. None of that had happened in the majority of the project area. It used the WEP model to look at erosion. And in direct contravention of what my opposing counsel said this morning, there was on the ground ground-truthing and verification of this modeling process. In fact, if you look in the record, in the supplemental excerpts of record at page 1041, during some post-modeling field reviews, there was the ground-truthing to see if the WEP model was actually, if the predictions of the WEP model were being borne out on the ground. They found that things weren't exactly right and went back in and adjusted the model based on what they found on the ground. I mean, that, I think, is exactly what this Court was getting at in Land's counsel. In Land's counsel, this Court noted that the Forest Service had not conducted the ground-truthing group survey, and that was not a ground-truthing and on-site verification within the project area. Instead, they had looked just in the forest generally and used that general information in a model. And that's just not the case here. There was soil testing during the initial immediate post-fire effort, and that's discussed in our excerpts of record. This is the EIS at 560 and 561. One year post-fire, there were more field reviews done that were unit-specific. These began in 2003. These have continued to today, because as the Forest Service committed in the EIS, in addition to the pre-project implementation on the ground verification and ground-truthing, it was going to continue to go out there and watch and look and make sure that if there were problems, they can adjust the boundaries. And, in fact, in our Exhibit Q, at page 200 in the Exhibit Q, we have a very clear boundary adjustment. Additionally, contrary to the discussions in the Plaintiff's Reply Brief, the EIS specifically sets forth the areas of potential soil compaction, the areas of past management that overlap with any salvage, and a watershed-by-watershed acreage of Federal lands with past management activities. Those are Tables 338, 340, and 41, which are found at SCR 579 and 580 and 1024. And this was, again, getting at the factors of displacement and compaction. Additionally, in order to run the WET model, you have to input data, which includes the type of soil disturbance. And we were taken to task in the Reply Brief for allegedly not using what is called the Soil Resource Index, which is the type of soil disturbance that is found in the inventory. In the Reply Brief, they refer to it as the SRI. In fact, as Appendix C of the EIS shows, and in our Supplemental Excerpts at page 1038, the Forest Service did use the Soil Resource Inventory and also used mapping and looked at soil stability measurements. And what's very important here is the Forest Service drew on its own experience from the Silver Fire, which burned in just about the same area in 1987. So the Forest Service is really in the best position to know exactly how to manage in this post-fire environment. And that's kind of what this case boils down to, is how to best manage a post-fire environment. So respectfully, we disagree with the statements that there was nothing done sufficient to satisfy NEPA or to satisfy NIFMA in this case by the Forest Service. I have a general question for you. In doing, in deciding whether or not the district court abuses discretion in denying the entry from no injunction, we have to weigh the harms. Does the Forest Service have any harm that they're citing other than economic loss? Yes. The harm is this risk of future high-intensity fire. And that's discussed in EIS. It's also discussed in the Soil Resource and the Link Declaration. One aspect of the project is to permit the Forest Service to meet its multiple-use requirement of providing some timber harvest on the forest in this, in these really non-ecologically, unlike a green sale, they're letting some salvage occur and you don't have to cut any green trees. And then another aspect of the project, and the purpose of the project, was to protect the surrounding communities and also to protect the firefighters from a future high-intensity fire. In fact, as I understand it, there's a fire burning right now on the forest because... And how does the timber harvesting relate to the protection of, you know, prevention of future fires? Well, the harvesting, there are other recovery aspects that are outside of the salvage harvest, but the salvage harvest is taking some of the dead wood and underbrush, some of the fuels that sometimes would stay on the ground that can lead to a more high-intensity fire. So the salvage does help, but the salvage is an independent purpose of the project. And the second purpose of the project, which is the Forest Service is actually going to be creating fuel management zones and other, and doing some other things to try to keep the fire from spreading. So there are, it's a separate purpose. The district court judge, I think it was his last paragraph, however, talked about this $2 million in economic harm to the government. Is that true? So that was important, or nearly we don't... Well, it is true that there is an economic harm to the government as well. The receipts from the salvage will be put to use for certain other restoration projects, replanting, et cetera. That money comes back to the Forest Service to do some beneficial projects on the forest, and that was in the record. And as Judge Nelson noted, that was very much at issue in the Siskiyou Regional Education Project case, which this Court affirmed the denial of a preliminary injunction in. And as long as I'm talking about that, I would just note that in the SREP case, as we call it, the consolidated case, and also in another case that we cite in our brief in the statement of related cases, which is the Forest Service Employees for Environmental Ethics case, that this Court just a week and a half ago affirmed the denial of a preliminary injunction. And Ms. Reagan is correct. The legal issues were different in that case. But the harms alleged by the plaintiffs and the balancing of the harms were the same. They alleged harms from violations of environmental statutes generally, and in the Forest Service Employees for Environmental Ethics, they alleged some improper marking of trees for riparian areas and the same potential issues to streams and fish. And the district court balanced the harm by looking at what they were alleging versus harms to the interveners, which my co-counsel will address, harms to the Forest Service, and this fracture of public interest, because there's very vocal opposition and there's also very vocal support for this project. So these are not binding on the Court. They're unpublished decisions. But it seems worth noting that two panels of this Court have balanced the harms the way that the district court did and found there was no abuse of discretion in the case based on the facts presented. And here the district court did more than just make one factual finding about five burned areas. In fact, in the excerpts of record at 440 to 442, the court made many factual findings. He looked at five burned areas. He found there was informal, the monitoring that I referred to during the immediate post-fire timing, the aerial mulching, other studies, and the surveys that had gone forward. And I already went through all of that. But the district court recognized that more than just five plots. And I guess I will turn to the POC argument. As it's been kind of confined a bit today, it's now a NEPA disclosure argument, whether or not there has been enough disclosure of POC. And respectfully, I disagree with my opponent's reading of the NEPA disclosure of the POC record of decision and final supplemental EIS, the programmatic documents about POC. There is nothing in those documents that establishes a prohibition on wet season activities. Nothing. It is one factor that might be used by the potential land manager in deciding how to best address the risks presented by two-port or ford cedar by the PL root fungus. So there's just not a prohibition. And likewise, I've got two seconds. I just want to point out in the EIS, there is an adequate discussion of port or ford cedar and the risk. And also I would point the court to the link declaration, which discusses in great detail how the Forest Service applied the risk key that the port or ford cedar requirements set forth. And I would just point the court to our brief as well. Thank you very much. And we respectfully request that the district court be affirmed. May it please the court, my name is Julie Wise and I represent the intervener appellees, the American Forest Resource Council, CLR Timber Holdings, and also Silver Creek Timber Company. The district court did not abuse its discretion in this case, Your Honor, regarding the wisdom of issuing preliminary injunctive relief. The standard of review is very deferential. This court has stated that many times, perhaps most recently, about a week ago in the Columbia River Dams case. And the court said in that case, upholding the issuance of a preliminary injunction, that review of the merits would be very deferential, limited only to whether or not the district court abused its discretion. And also relevant in that case, the underlying merits of the facts, the science, were hotly disputed. That's similar to this case. And the court said that it would be very deferential, again, to the factual findings, and that only if, after reviewing the entire record, it was not plausible for the court to have reached certain factual findings, that the opinion would be upheld. And that is the posture we find ourselves in here today. Your Honors, it is not true that the standard for an injunction is totally different in environmental cases. It is true that the Supreme Court admitted in the amico, or acknowledged in amico, that oftentimes environmental harm can be presumed to flow from failure to abide by environmental laws. But that is not always the case. In fact, in amico, the district court had actually declined to issue an injunction, despite finding a high probability of success on the merits. The Ninth Circuit reversed and said that a high probability of success on the merits meant that an injunction should flow from that, absent unusual circumstances. And the Supreme Court in amico said that's not the way it works. The Supreme Court said that the interests represented by environmental statutes do not automatically trump all the other interests, and that you have to look at the interests that are being alleged. And in that case, in amico, the court noted on one hand that the intervenor oil companies were opposed to, they were going to lose millions of dollars that had been invested in this exploration of oil and gas leases off of Alaska's Outer Continental Shelf. And so that was a situation in which the Supreme Court acknowledged the propriety of looking at factors such as a company's investment in balancing its own interests. And in amico, the district court had actually declined to issue an injunction, despite finding a high probability of success on the merits meant that an injunction should flow from that, absent unusual circumstances. In this case, the district court had a lot of information in front of it in balancing the harms. This is not a green sale. These trees are dead. Only dead trees are being logged. No trees with live green needles at all. This is a case in which the district court had a lot of information in front of it in terms of dead timber on the ground, dead trees on the ground that were decayed, they were losing value. This was a resource. It's not just in terms of money, Your Honors. This is a resource that will never be able to be recovered. These are dead trees. Once they fall to the ground, the district court heard testimony that the decay would speed up, be very quick. And we also had testimony from the intervenors, Your Honors, that there were many people out there who were in the forests. We had jobs at issue. We had a new mill that was coming online and providing jobs in an area of high unemployment. And if Your Honors reviewed the transcript, particularly the testimony of CLR Timbers Virgil Frazier and Silver Creek's John West, the harms were before the district court, and the district court properly balanced those harms. Your Honor, I'd like to briefly touch on the soils issue also, because I do think that it's important to acknowledge that this case is not like Lands Council. Lands Council was a case in which the Forest Service was trying to remedy the effects of past logging. This is a case in which the Forest Service is seeking to remedy the effects of a massive forest fire. In Lands Council, the prior logging had covered something like 40,000 acres in about the last four decades. In this case, the record indicates that there are only about 2,000 acres that have previously undergone land management. That's a big, big difference. In Lands Council, Your Honors, this Court recognized that the Forest Service did not go out and try to validate its model for determining the status of the soil. In this case, the record is there are so many citations to where the Forest Service actually went out to look at the soil. You heard a few from counsel for the Forest Service, and I would refer you also to pages in the supplemental excerpts of record 999 through 1008. Particularly 1000, I believe, talks about a lot of the different types of things that were done. SCR 576 talks about looking at the effects of past logging and using that to determine how the project could actually benefit the environment. SCR 579 talks about past timber harvesting and how that has affected the 2,000 or so acres at issue. Table 3-34 in the supplemental excerpts of record, page 1019, there's a table that actually shows the acres of potential soil displacement by logging systems by watershed. And these are just some of the ones that Forest Service counsel has already given you. This case simply is not like Lands Council. Your Honors, even if the Court had concerns about the NEPA analysis, and I don't think that the Court should have any concerns, it is important to understand that that would not mean the district court erred in declining to issue an injunction. There are cases such as Four Laws on Board v. Johnson in which this case, excuse me, this Court declined to issue an injunction. Despite finding a violation of NEPA. In the Fund for Animals, Inc. v. Lujan, that's a 1992 case out of this court, the Court said that we don't even need to consider whether or not there's a serious question on the NEPA claims because of the balancing of harms. And the Court also stated that merely establishing a procedural violation of NEPA does not compel the constituents of a preliminary injunction. We don't believe that there has been a NEPA violation in this case, but even if there was a concern about that, an injunction would not work. Counsel, let me just ask a question. Right now, there's no injunction, logging's going on. Yes. Suppose at the end of it, it turns out there was a NEPA violation. What then? How do you remedy it? Well, Your Honor, a NEPA violation is remedied by doing more NEPA. And so if at the end there is no further analysis to be done, then I believe you're right that there couldn't be a remedy at that point. But there has not no one has demonstrated that there is a serious question under NEPA. And further analysis has been going on ever since the district court issued its decision. There has been more on-ground work being done. And so even if the district court overlooked something at that time, subsequent NEPA analysis has been done. All right. Thank you, Counsel. You're out of time. Cascadia v. Conroy will be submitted. You went over by eight minutes. All right. Well, this court, this session of this court will be in adjournment. Thank you. This court is adjourned.
judges: Noonan, T.G. Nelson, Wardlaw